THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT McNAMARA ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| SWANSON, MARTIN & BELL LLP ) | No.: |
| ) | |
| Defendant. ) | JURY DEMANDED |
| ) | |
| ) | |

## COMPLAINT

Plaintiff, Robert McNamara ("McNamara"), for his Complaint against Defendant, Swanson, Martin & Bell LLP ("SMB"), states as follows:

### INTRODUCTION

1. McNamara asserts claims against SMB for (1) a violation of the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA") arising out of SMB's termination of him almost immediately after he disclosed his diagnosis of Posterior Cortical Atrophy, and (2) intentional infliction of emotional distress.

### PARTIES

2. McNamara is an individual residing in Wilmette, Illinois. He is an attorney who has practiced law in Illinois for 33 years.

3. SMB is an Illinois limited liability partnership located at 330 North Wabash, Suite 3300, Chicago, Illinois 60611. SMB is a law firm which employs over 200 people.

## JURISDICTION AND VENUE

4. The parties to this action reside within the jurisdiction of this Court. The Court has subject matter jurisdiction under 28 U.S.C. §1391(b)(1) and (2).

5. On June 9, 2020, McNamara filed a timely charge of disability discrimination with the Chicago District Office of the Equal Employment Opportunity Commission. The EEOC issued McNamara a right-to-sue letter on December 29, 2020, a copy which is attached as Exhibit A.

## BACKGROUND

6. McNamara was admitted to practice in Illinois in 1987. He received his J.D. *cum laude* from Loyola University School of Law in 1987 and his B.A. from the University of Notre Dame in 1984. Over the years, McNamara focused his practice on product liability, toxic tort, asbestos, construction, and fire and explosion litigation.

7. In April of 2013, after nearly 20 years at another large, Chicago law firm, McNamara accepted SMB's offer to join SMB, as a junior, or non-equity "partner", to be eligible for equity partnership. McNamara joined SMB at the urging of George Fitzpatrick, an SMB partner with whom McNamara had been close personal friends for decades. SMB publicly identified McNamara as a "partner" in the firm and identified him as a "partner" in its press release announcing the lateral move. (Exhibit B). In that position, McNamara was precluded from working for another law firm, and from handling legal matters on his own outside of the practice of SMB.

8. The essential functions of McNamara's job as an attorney for SMB consisted of legal analysis and written and oral communication. McNamara never received verbal or written warnings, disciplinary actions, or reprimands during his employment with SMB.

**McNamara's Employment Agreement with SMB**

9. When McNamara joined SMB, he signed an employment agreement that SMB titled "Independent Contractor Agreement" (Exhibit C). In that document, SMB represented that McNamara would have the opportunity to be considered for equity partnership in 2016, and further provided that the criteria for such consideration would include "loyalty,…leadership, supervising capacity [and] teaching capabilities…." (Ex. C at ¶11).

10. The agreement also contained several provisions which inaccurately described McNamara's relationship with the firm. For example, the agreement contains a "No Benefits" clause in which McNamara purportedly agreed that "a material component of…this Agreement is that Contractor Attorney is not eligible to participate in any benefit plans, insurance plans, or policies that the firm maintains for its employees and equity partners." (Ex. C at ¶7). However, SMB provided McNamara with health insurance from the first day he started working at SMB and maintained him on its health insurance policy until it fired him. SMB also paid for and provided McNamara professional liability insurance coverage throughout his employment. (Ex. C at ¶9.)

11. The agreement purportedly required McNamara to "solely determine…the need for and hiring of agents, assistants or employees at [his] own expense." (Ex. C at ¶4). SMB, however, provided McNamara with secretarial assistance and associate attorneys to assist him in his day-to-day work.

12. The agreement also purportedly required McNamara to fund a home office and his equipment and supplies. In reality, SMB provided him with an office, laptop, cellphone, business cards, all office supplies at SMB expense, and McNamara performed his work from SMB's offices.

13. The agreement also provided that he was "responsible for all expenses incurred in the performance of this agreement [including] payment of all client entertainment expenses, business development expenses, and travel expenses." (Ex. C at ¶8). However, at the same time,

SMB expressly promised to pay $8,000 per year for client expenses and development. (Ex. A to Ex. C).

### McNamara Experiences a Decline In Visuospatial Skills In the Spring of 2019

14. Beginning in about the Spring of 2019, McNamara experienced a decline in visuospatial skills, which impacted his ability to accurately perceive depth and distance, and to solve math problems.

15. Friends and others began to notice that something was wrong with McNamara. For example, in April of 2019, while on a trip to Washington D.C. with Fitzpatrick and another mutual friend, "A", McNamara had difficulty calculating the appropriate amount to pay for cab rides. Then, in early August, McNamara, while playing golf with "A," had difficulty navigating the course. "A" became so alarmed by what he observed that he called McNamara the next day and strongly urged him to see a doctor, specifically recommending Dr. Robert Havey.

16. McNamara saw Dr. Havey on August 15, 2019, and was given various cognitive tests. Dr. Havey ordered an MRI and referred McNamara to doctors at the Neurobehavior Clinic at Northwestern Memorial Hospital.

17. On September 3, 2019, McNamara was examined at Northwestern, where he underwent further testing. On a return visit to Northwestern on October 4, 2019, McNamara was formally diagnosed with Posterior Cortical Atrophy ("PCA"), which, according to his doctor, impacts visuospatial functioning, but "spares one's ability to speak, write, reason and teach."

### McNamara Shares His Diagnosis With SMB; SMB Promptly Fires Him

18. Beginning in at least the Spring of 2019, SMB knew or had reason to know that McNamara was having cognitive issues and, on information and belief, knew in August 2019 that he had seen a doctor about such issues. Fitzpatrick had personally observed McNamara's

visuospatial difficulties and, on information and belief, had been informed of other incidents. In addition, McNamara's billed hours for the months of July, August and September of 2019 were uncharacteristically low.

19. Accordingly, in or around August and September of 2019, SMB began internal discussions about a plan to terminate McNamara. SMB formulated that plan without engaging in any reasonable accommodation interactive process with McNamara, despite the fact SMB knew or had reason to know that McNamara's purported workplace difficulties were potentially related to medical issues he was experiencing. Indeed, SMB was hoping to achieve a "preemptive strike" termination before McNamara informed SMB of his actual diagnosis and prognosis. SMB kept this plan secret from McNamara.

20. On or about October 7, 2019, McNamara told Fitzpatrick (who had just returned from a trip to Portugal) about his PCA diagnosis in the spirit of full disclosure and because he considered Fitzpatrick a friend. Even after direct disclosure of his medical condition, however, SMB continued to fail to engage in any interactive process whatsoever to determine whether a reasonable accommodation could be identified and made for McNamara. In fact, within days of such disclosure, on or about October 11, 2019, McNamara was summoned to SMB's Managing Partner's Office, where he found Fitzpatrick and the Managing Partner waiting for him. Rather than engage with McNamara further at this meeting about what, if anything, he may need in terms of a reasonable accommodation (as McNamara assumed when summoned), SMB chose to turn a blind eye instead and summarily terminated him.

### SMB's Conduct Surrounding The Termination

21. When SMB fired McNamara on October 11, 2019, its Managing Partner told him that he was being terminated because of his medical condition. No other reason for McNamara's

termination was ever provided.

22. McNamara was stunned by SMB's actions, and SMB pounced on McNamara's already fragile emotional state by demanding that he contact each of his clients and (1) inform them that he was "winding down his practice" due to "his medical condition", and (2) urge them to remain with SMB. SMB specifically identified Commonwealth Edison – which had recently retained McNamara on a major case – Allianz and Louis Vuitton as clients which McNamara had to contact. In his fragile emotional state and without other reasonable alternatives, McNamara acquiesced to SMB's demand, something he never would have done without SMB effectively coercing him into doing so.

23. On or about October 14, 2019, McNamara made such calls in the presence of SMB's Managing Partner, reading from a script prepared by SMB. This exercise was deeply humiliating to McNamara. Moreover, these actions effectively insured that McNamara would be unmarketable to another law firm.

24. McNamara's last day at the firm was November 9, 2019; by that date, all of his client matters had been "transitioned" to another attorney at SMB, just as SMB had demanded.

25. Given McNamara's particularly fragile emotional state, SMB also knew that its plan to have McNamara jettison his clients was likely to succeed.

26. SMB's actions caused McNamara severe emotional distress. It was embarrassing enough for McNamara to be told that he was essentially worthless as a lawyer, but then he had to relive that shame and embarrassment in calls to every one of his clients. Nearly every day from October 11 through November 9, 2019, McNamara returned home from the SMB office in tears. He also suffered headaches and had great difficulty sleeping, often walking around in and outside of his house in the middle of the night. McNamara also frequently and uncharacteristically

expressed anger to his family and friends.

## COUNT I
## Violation of ADA

27. Plaintiff restates Paragraphs 1 - 26 as Paragraph 27 of Count I.

28. SMB is an "employer" and McNamara is an "employee" under Section 12111 of the ADA. Among other things:

   a. SMB required that McNamara work full time for the firm, precluding him from offering his services elsewhere;

   b. SMB paid for McNamara's health insurance;

   c. SMB paid for McNamara's professional liability insurance;

   d. McNamara kept regular hours at SMB's office and, at SMB's request, attended all partner meetings and dinners;

   e. SMB held McNamara out to the public as an SMB partner and employee through its website, emails and business cards;

   f. SMB provided McNamara with an office, cellphone, business cards, laptop and all other office equipment and supplies;

   g. SMB provided McNamara with secretarial assistance and firm associates to assist him on his day-to-day work all of whom were paid by SMB;

   h. SMB paid McNamara's client development expenses; and

   i. McNamara's services were an integral part of SMB's business.

29. McNamara is a member of a protected class based on his disability and/or perceived disability. Moreover, McNamara is a "qualified individual" under Section 12111 of the ADA in that his disability and/or perceived disability does not impede him from performing the essential functions of his job as an attorney with or without reasonable accommodation.

30. SMB terminated McNamara from his employment on the basis of his disability and/or perceived disability in violation of the ADA. Such violation was willful.

31. SMB failed to engage in any interactive process whatsoever to determine if a

reasonable accommodation was necessary and could be made to avoid discrimination on the basis of his McNamara's disability and/or perceived disability in further violation of the ADA.

32. As a result of SMB's unlawful discrimination, McNamara has suffered and continues to suffer damages.

WHEREFORE, McNamara requests that judgment be entered in his favor including the following relief:

a. An award of compensatory damages, including damages for emotional distress, to be determined at trial;

b. An award of punitive damages for a willful violation of the ADA in an amount to be determined at trial;

c. Reinstatement;

d. Back pay in an amount to be determined at trial;

e. In the event reinstatement is not granted, front pay;

f. Reasonable attorneys' fees and all costs of suit; and

g. Such other relief which this Court deems just and equitable.

## COUNT II
### Intentional Infliction of Emotional Distress

33. Plaintiff restates Paragraphs 1 - 32 as Paragraph 33 of Count II.

34. SMB's conduct was extreme and outrageous, and SMB either intended to inflict severe emotional distress or knew that there was a high probability that its conduct would do so.

35. Among other things, SMB knew that McNamara was particularly susceptible to emotional distress. For example, SMB knew that several years prior to his termination McNamara had suffered from emotional distress. After his sister's sudden death in April 2016, McNamara was left in a state of depression and anxiety, which ultimately resulted in a nervous breakdown while at work and a brief hospitalization in December 2016. McNamara was diagnosed with

- 9 -

depression, a condition which he was able to keep in check with medication.

36. SMB also knew that McNamara's emotional state was particularly fragile in October of 2019 after he received the jarring diagnosis of PCA. SMB exploited McNamara's fragile emotional state to coerce him into making the humiliating calls to his clients.

37. SMB's conduct actually caused McNamara severe emotional distress.

WHEREFORE, McNamara requests that judgment be entered in his favor including the following relief:

    a. Compensatory damages in an amount to be determined at trial;

    b. All costs of suit; and

    c. Such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

*/s/ Paul K. Vickrey*
Paul K. Vickrey (vickrey@vvnlaw.com)
Gretchen L. Schmid (schmidt@vvnlaw.com)
**VITALE, VICKREY, NIRO, SOLON & GASEY LLP**
311 S. Wacker Drive, Suite 2470
Chicago, IL 60606
Tel: (312) 236-0733

*/s/ Michelle Reese Andrew*
Michelle Reese Andrew
(michelle@andrewlawgroup.com)
**ANDREW LAW GROUP LLC**
600 Green Bay Road
Kenilworth, Illinois 60043
Tel: (312) 612-0149

***Attorneys for Plaintiff, Robert McNamara***